The next case on the calendar is Lacewell v. Office of the Comptroller and we have Mr. Connolly for the appellant. Hi, good morning, Your Honor. Can you hear me? Yes, perfectly. And Ms. Underwood for the appellate. I think you're on mute, Ms. Underwood. Just let me check to make sure we can hear you okay. Good morning. Good morning. All right, so we'll proceed. Mr. Connolly, I see you've got it. Go ahead. Yes, thank you. Good morning and may it please the Court. Christopher Connolly from the U.S. Attorney's Office on behalf of the Office of the Comptroller of the Currency. The District Court erred in three respects. First, it incorrectly held that the New York Department of Financial Services had standing to challenge OCC's chartering authority and that DFS's claims were right. Even though OCC has not yet received, let alone acted upon, an application for a special purpose national bank charter from a non-depository fintech. Second, the District Court erred in declining to extend Chevron deference to OCC's interpretation of the National Bank Act, instead holding that the act unambiguously requires that institutions must take deposits in order to qualify for a charter. And finally, the District Court erred by prohibiting OCC from entertaining charter applications from all fintechs nationwide, regardless of whether those fintechs have any nexus to New York. Mr. Connolly, may I just ask you on the standing issue, you made reference to having received no application. I saw after the briefs were filed here, there was a lawsuit filed again in D.C. in December that alleges that Bigger Technologies Inc. has applied for a PNB charter and made it a non-depository fintech. Are you aware of that? I am not aware of that, Your Honor, nor am I aware of whether that entity is, in fact, non-depository such that it would come within the ambit of the issues that we're discussing here. There still has been no application? To my knowledge, there has been no application, no application submitted, and no application under consideration at this point. All right. Do you concede that if they were, I know there was a conclusory statement in their brief that in preparation for this, that they, there's some expenditures of money, you would, I think, would you concede that if, in fact, in preparation for this possibility, they had to incur a cost, that that would create standing? Would you concede that? Incurring costs by DFS, Your Honor? Yes. I don't know exactly what those costs are. I don't think that... In their brief on page 32, they talk about the fact that this Bank of Tokyo case, where I think your office took the position that once a national bank charter was granted conditional approval, that they could not then continue to investigate them under state law. And so they, I think they suggest that, I don't, there's no evidence in the record of this, I guess, this was a problem, but that they may have to finish up enforcement actions more quickly because of the concern that this might happen under these circumstances, too. What's your response to that? Bank of Tokyo, obviously, was not a special purpose national bank chartering issue. So we're talking about a different activity by OCC. We're not talking about the issuance of the national bank charter. I believe it was conversion of, the conversion of branches, I believe, to being federally regulated. So I don't know that there's a one-to-one correlation between what they described there and any financial costs the DFS might... They're saying OCC could take the same position here, that once one of these are granted, their regulatory authority ceases. They can't charge that bank any longer with any pre-conversion conduct. So I understand it's not the same situation, but I'm not sure why it would be that OCC might take the same position here. It's possible that OCC would, and I believe that the analogous point in time, though, that we've been talking about in this case, and I do not know what position OCC would take, but it's what's called preliminary conditional approval. We describe in our brief kind of the lengthy chartering process that you go through. Preliminary conditional approval is, as its name suggests, preliminary and conditional, and it allows OCC to begin to fund the bank in preparation for a final approval. There's an argument to be made that at that point, New York might be able to articulate standing based on the imminence of an injury, in fact. Certainly at that point, that still would not be actual until the charter is actually approved. Ms. Connolly, could you give me an example of a Fintech? In other words, I don't mean, you know, John Jones Incorporated. I mean, could you tell me how we could tell what sort of entities OCC is interested in here and just make it concrete a little bit? Well, Your Honor, I think that's one of the things that speaks to the standing and rightness issues in this case, which is that the term Fintech can be applied very broadly to a host of entities that are engaged in a host of activities. Well, yes, but of course, your regulation on its face doesn't talk about Fintech at all. It says any, and am I right that under the regulations language, my local neighborhood loan shark is engaged in the business of banking because he lends money on a regular basis and lending money is enough to make you engage on a regular basis. I don't mean if I lend money to my sister, I mean, someone whose regular practice is to lend money is in the business of banking and therefore is eligible for a charter according to the OCC. Am I wrong about that? Your Honor, I mean, there are obviously a lot of other considerations that OCC is going to take into account. I understand that there are many considerations they might take into account as to whether to issue a charter. What I'm asking you is under your regulation, is the loan shark eligible for a national charter? You may decide you don't want to regulate loan sharks. I understand that. Insofar as he's lending money, I guess one might say that he's engaged in one of the three core banking functions, but that is... that's all it takes to be engaged in the business of banking. Yes? You have to engage in at least one of those three activities in order to be engaged in the business of banking. And if you do, then you are in the business of banking. If you do, then you are engaged in one of the three core banking functions and at least in theory would be able under that regulation to put in an application. There's a bar and grill in my neighborhood that has a sign outside that says we have a deal with the bank. They don't make burgers. We don't extend credit. If they renege on that hypothetical deal with the bank and start extending credit, maybe even cash advances to some of their customers, they could be in the business of banking under this regulation. Again, one could say that they were engaged in one of what OCC has identified as the core banking function. But you see, this is part of my... maybe I'm trying to understand even with respect to the standing issue of what is it that is under challenge here. For example, the state seems to take the position that in order to be in the business of banking, you must be a depository institution. You must take deposits. And I'll have some questions for them about whether that's necessarily right. I could imagine at least an example of this. I could see an argument that they're in the business of banking because of the kind of lending that they do. But another way of looking at this case is, is your regulation at all reasonable if you're saying that all it takes to be in the business of banking is lending money? Isn't that what the regulation says? The regulation says that you can apply for a charter if you engage in one of these three core banking functions. Because any one of those functions is sufficient to make you be in the business of banking. You don't need to have two. As long as you have one, then you qualify. You can apply for the charter. And again, I think... So the loan shark is definitely in and maybe the bar and grill as a possible applicant. They might want to. You might not want to give it to them, but they are in the business of banking as the OCC interprets that phrase. I think there's a distinction and it may be kind of a fine one, but there's a distinction between engaging in an activity that one might conceivably say is one of the core banking functions. But then being engaged in the business of banking, when you look at the way that term is used in the National Bank Act and the provision in the National Bank Act that authorizes... Well, but I thought that the issue in this case is whether your regulation is a... Assuming we get to the merit, whether your regulation is a reasonable construction of the business of banking. And I thought that the regulation says, and it seems to me you've confirmed that, is that anyone who on a regular basis lends money is in the business of banking under that regulation's interpretation of the National Bank Act. They're engaging in some form or fashion, arguably in one of the core banking functions. Yeah. Well, so what, if anything, is in the regulation or any parallel regulation or any part of the regulatory framework that would allow the OCC... I understand they have a lot of discretion. Even if somebody applies to a bank, they keep bankers' hours, they have big marble columns in front, they're stuffy kind of guys. Anybody who... They're a depository institution. You don't have to give them a charter if for whatever reason you don't want to. But what is there in the regulatory structure, if anything, that would say the local loan shark is not engaged in the business of banking and is not eligible? Well, I mean, I think the framework, the purpose of the NBA is obviously for OCC to ensure the safety and soundness of the banking industry and to protect consumers of the banking industry. And so just in terms of the general purpose of the NBA and what it's meant to do and what OCC is obliged to do, the loan shark, the bar and grill, they're simply not going to be entities that are going to receive those types of charters. And in terms of... But isn't really the point that because they don't take deposits and they don't have checking accounts and they don't do any of the other things that are the business of banking, they're not really bankers. Notwithstanding that they engage in lending money. I think that ultimately would be where OCC would come out. But when we're talking about... We're talking about... But then doesn't that tell us anything about what the business of banking actually means under the National Bank Act? That it would be silly to say that the loan shark or the bar and grill is a bank and it's engaged in the business of banking. That's true, but it wouldn't be silly to say that a company that offers other types of financial services like mortgages or payment, like online payment services and things like that would be the rigorous regulation scheme that the NBA provides. Right. And I may well be with you about that. And I may well agree with you that taking deposits might not be necessary. But again, this brings me back to my question of what is the issue here? If we get to the merit, is the issue something about whether your regulation makes any sense at all as an that there needs to be deposits. So even if there was something that in many respects looked like a bank or looked like they were in the business of banking, they'd say still doesn't count because the law requires that it be a depository institution. And so I'm trying to figure out, is that the argument that this case is about? Is the depository is deposits necessary under the National Bank Act? Or is there some question about whether your regulation is overbroad, even if we don't agree that deposits are necessary? The only argument that DFS raises in opposition to OCC's chartering proposal here and receptivity to these types of applications is that an entity needs to take deposits in order to be to qualify as a bank and to be eligible for a charter. That's the only issue that they raise. And my last question, I guess, is just to focus this even further. There's the paying checks is kind of a red herring here because I'm having a hard time understand how you would do anything that could be called paying checks. If you're not either taking deposits against which the to somebody and then expecting them to pay later when you honor their draft checks, PayPal, whatever that means thing, you're either extending credit or you're doing deposits. And no one here is talking about paying checks as a big deal. Your Honor, given the wide breadth of activities that banks engage in, I don't want to say that there's no instance where paying checks would not on its own be a core banking function that the entity could engage in, you know, without engaging in one of the others. I don't have an example to you. I'm at a disadvantage because I don't understand what paying checks actually means under this regulation. I don't understand what a check cashing entity does when there are these neighborhood places where people can get their paychecks, people who don't have bank accounts. Is that what cashing paying checks is? Your Honor, that might be an example of paying checks. Yes. Well, what do you regard it as what you're interested in? What do you regard as paying checks of a nature that might lead you to qualify somebody under OCC's regulation? As I sit here, I don't have an example of an institution that might be solely or primarily involved in the paying of checks. The example that you gave may be an example of an institution that that would be the one core banking function that they would engage in. But again, we... Cashing checks is what you mean, not honoring checks ultimately. You know, having... Paying. Right. I mean, paying checks... My grocer back in the day when there were no ATMs used to cash my checks. And they did on a regular basis for lots of people. You'd come in with a check and you'd pay your grocery bill and they'd give you some cash back too. And they would do that as a regular thing. So that's what you mean. I don't know that that would be primarily or exclusively what we'd be talking about when we'd be talking about paying checks. And again, I apologize, but I don't have an example of an institution whose sole core banking function would be the paying of checks. I think though that in some respects, all of this conversation and all of this attempting to imagine and what I think the DC District Court in the CSDS case, CSDS-1 described as the unimaginably wide variety of potential FinTech applicants goes to the heart of our standing and rightness issues, which is until you have an actual applicant with an actual business model and an actual geographic scope of proposed activities, it's very difficult to articulate any actual or imminent harms that befalling DFS as a result of OCC's near receptivity to receiving these types of applications. That also speaks to obviously the prudential rightness issue. Even if you think that they're standing now based solely on OCC's willingness to accept these applications, there are still good reasons to refrain from a judicial decision until we have an applicant who is intending to do business in New York. On the prudential rightness question, I know there was some laying out of like 30-day notice period and preliminary approval. What's the quickest possible approval that OCC would suggest could take place if there was an application? How long would it take? I don't know. I don't know for sure, Your Honor. I think it's going to be measured though in months because you have to get the application in. There has to be noticed that the and then OCC needs to do the work of preliminary conditional approval. I think what happens primarily at the preliminary conditional approval stage is that OCC is going to place requirements on the entity. What's the quickest time the OCC has ever granted a charter? Anything. A domestic thing. I'm not sure what the quickest time. I'm not sure what the quickest time is. I'm happy to follow up after the argument. That's okay. All right. Go ahead. Answer the question. Again, just to reiterate, Judge Bianco, I think that it would probably be at least a matter of months given the time frame and the work that OCC needs to do before a charter reaches the final approval stage. I'm a little puzzled by, maybe I should be waiting to say this to the one needs to take deposits, seems to be odd to me in the context of history because historically, the banking function, when you look back over history at the laws in France and the Medici and so forth, what made them bankers was extending loans. In some ways, the people who extended loans were a lot like the loan sharks in Judge Lynch's hypothetical. I don't know that the Medici took deposits. Maybe they did. I don't know, but one thinks historically of those who were regarded as the bankers to the crown, the bankers who got wealthy by financing the right side in political and royal disputes and stuff like that. They were lenders. That was what a banker was, was somebody who loaned money. One of the things that gave Jews a big advantage in that kind of trade was that charging interest was forbidden to Christians, but Jews were able to charge interest and therefore achieved a certain amount of dominance in what was known as the banking industry which didn't involve marble and columns but was kind of a personal business. I'm just puzzled in the abstract by the notion that in order to be a bank, you need to accept deposits, but anyway, that's something I will ask the other side, but I wonder whether you have something to say about the history in that regard. Well, Your Honor, I think your point is well taken and I think it's correct. Nobody disputes that taking deposits is a core banking function. It's something that banks frequently do, but it's not something that banks always do or always have done. It is one of any number of activities that banks often engage in, and I think you see this reflected both in the language of the in the history of the legislative history, particularly as New York brings up the New York Banking Act, which did talk about banks having to be banks of discounted deposits, but the National Bank Act didn't make that same kind of requirement, and we talk in our briefs about trust banks being an example of banks in the modern era that do not take deposits. Credit card banks being another nationally chartered type of bank, they frequently hold deposits, but they're frequently what's called like an affiliate deposit. It's a deposit that's placed there, I guess, by another financial entity. It's not the kind of place where you go in and open an account that you can then draw on on demand. So I think your point is well taken that banking is broader than that, and while deposit taking fits into it, it is not the essence. It is not a requirement. All right. Thank you, Mr. Connelly. Ms. Sunderwood's been waiting a long time. I'm sure she wants to be heard now, so we'll hear from Ms. Sunderwood. Go ahead. Thank you. Good morning. The OCC has exceeded its authority under the National Bank Act by offering a national bank charter to entities that make loans or transmit funds but do not take deposits, and it's a statute we're construing here, not what banking has ever been, although what banking has ever been sheds some light on the meaning of words. But the statute doesn't say that, does it? Well, we could go right to the statute, or we could talk about standing. The statute doesn't say it in so many words because the statute was written at a time when definitions of terms were not the norm. But the purpose of the National Bank Act in 1863 was very specific. It was to create and stabilize a uniform money supply. St. Banks were creating something that was used as currency by issuing banknotes or loans secured by deposits, at first of gold, and a national bank and a national regulator were created to stabilize the value of those notes so they could function as a national currency. That's why the office created by the Bank Act is called the Controller of the Currency. And the statutory text reflects that purpose, namely to create national institutions to engage in the business of banking, which at that time had the settled meaning of taking deposits and making loans or issuing notes backed by those deposits. The term isn't defined in the statute. 12 U.S.C. 24 7th says a national bank shall have the powers necessary to carry on the business of banking and then lists a number of powers that are useful for that purpose but aren't definitional. They're very... Is your point then that the institution needed to take deposits in order to have a sufficient backing to make the currency reliable? Is that the point? That is correct. That is correct. And we know that receiving deposits was essential to banking under the NBA for several reasons in addition to that general purpose that was paramount in 1863 when the OCC was created and first authorized to charter national banks. First, it was... Receiving deposits was essential to banking under New York's 1838 banking statute, and that was a model for the federal statute. The New York statute authorized... It was very similar language. Authorized the formation of institutions to carry on the business of banking and then listed discounting bills, notes, debt, receiving deposits, and so forth and so on. And soon after that statute was enacted, some entities purported to be banks of circulation only with no deposit. And in 1848, the New York legislature rejected that practice and added a sentence clarifying that all banks under New York law shall be banks of discount and deposit as well as of circulation. Ms. Underwood, the federal NBA didn't adopt that language. That's correct. That's correct. But the federal NBA was read as incorporating the New York understanding of the business of banking. It didn't use the clarifying addition, but by 1863 when the federal law was enacted, the clarification was no longer necessary. And surely if Congress were rejecting a central feature of the New York statute, it would have said so. That list of functions that are given to national banks, which is, I guess, a slightly different question than what makes you eligible to be a bank. You mentioned, of course, taking deposits is one of them. It's one of the things you get by a national charter. But there are other things you get under the definition of the National Bank Act that you don't actually get anymore because the Federal Reserve has taken them over, right? That's correct. It's not definitional there. I understand it's not definitional, but does that not suggest that the business of banking can change over time? Well, it suggests that some of the particulars, yes, in particular that some of the functions can become obsolete. But what is clear is that it can't become something else entirely. It can't become the business of selling cars or the business of loan sharking. The whole idea, after all, of the National Bank Act was to stabilize the currency, to make it secure. And one of the ways it did so, an important way at that time, was to require receiving deposits. Later, it came to pass that there was federal deposit insurance. And that was another way, an important way to make banking secure. And when federal deposit insurance was established, national banks were required to have it. That is 12 U.S.C. Section 222. My colleague says that they only were permitted to have it because 1815A1 says a national bank may obtain it, is eligible to obtain it. But that's in a part of the statute that just lists who can get deposit insurance. In 222, there is a statement that a national bank is required to obtain it. Well, what about investment banks? Things that are called, that's part of the conventional terminology for certain kinds of institutions. Yeah, piggy banks too exist, but I think that what OCC... Well, piggy banks take deposits. Yes, they do. Don't necessarily lend or contribute to the circulation of money. The idea, the whole idea of the National Bank Act and the OCC chartering national banks was to create a set of institutions that would generate something like currency. This is before the federal government took over the issuance of currency. And it would be secure, and it would be made secure by deposits. Later, it would be made secure by insurance. I'd like to point out that when OCC tried to charter a non-depository bank, a trust bank, it took an amendment of the NBA to save that charter. The NBA was amended mid-litigation, mid-litigation to challenge that charter and to specifically authorize the formation of trust banks. And the third circuit that was at that time hearing a challenge to that charter said it was upholding the charter because of the amendment, and otherwise it wasn't sure it could. It didn't decide that it couldn't. Well, yes, it didn't decide that it couldn't. So this is not a case where even a single circuit decided that the OCC didn't have this authority. Congress acted in a hurry to, some might say, clarify that the OCC could do that. Some might say clarify, and some might say add an authority that the OCC wanted. It is not definitive, but it's on the point. And we don't have law on the point because the OCC, other than that instance and now, has never tried to charter a non-depository institution, so there's not a lot of litigation. That may bring us back to the standing that you wanted to perhaps start with and is logically prior. One of the problems I have with this case is we could look at this regulation in the abstract and wonder whether banks just have to lend money because that's how the Medici got started, or whether it matters what Congress was focused on in 1863 as to what banking might have been and whether lending is enough. But is this solely about the abstraction here, or is it about what they are going to do or not do? Suppose they came, somebody applies, which has a much more complicated set of businesses that it does. One of them is lending money, some kind of payment system. I'm not sure what exactly that would mean. But one of them is not taking deposits. But there's a lot of activity, and that activity has a lot in common with the things that banks now do. Would we then be considering whether, on the totality of the circumstances, that institution was engaging in the business of banking and therefore it was appropriately regulated? Well, that would be a different claim and a different issue from the one that the DFS brought this case to assert that OCC has no authority to charter any kind of non-depository institution. Okay. So in your view, the only issue in this case, on the merits, if you're standing to bring the case, the only issue is, is it absolutely required that there be deposits? And if the answer to that is no, you lose. No, I would say that if the answer to that is no, then there should be a remand because the complaint challenged the regulation and the reasonableness of the regulation. The district court didn't decide that claim. The district court found that the policy here was invalid because of the absence, because it authorized charters to non-depository institutions. So if you concluded that that was incorrect, then there should be a remand for consideration of the other aspects of this. But what if they never actually charter a non-depository institution, or maybe more realistically, what if they charter something that, unless you're right, that deposits are necessary, would have so much in common with banking? I guess I'm asking in sort of a declaratory judgment that they're wrong in the abstract about their abstraction, when we have no idea whether the concrete reality of what they're going to do, which they've not done yet, is reasonable or unreasonable. Well, if the rule of law were that they can sometimes charter a non-depository institution, then we would need more facts to determine whether that rule was implicated here. We are here saying that the rule of law, that the proper interpretation of the National Bank Act, is that the OCC is not authorized to charter a non-depository institution. Right, and why is that a case or controversy if there's no clear indication that they actually ever will? Well, I think that's not a correct statement, that there's no clear indication that they ever will. Let me just say that when a national bank charter is issued to any non-depository institution, DFS will be injured in several ways. It will lose the ability to enforce its own laws against that bank, that new bank, because a national bank is governed by the usury laws of the home state and not of the transaction state. It'll be weakened in its ability to enforce New York's... Thunderwood, none of those things will happen unless there's an application. I think we've been talking about prudential rightness, but you need to articulate a harm. Okay. You talk about loss of funds from assessments being levied on state harm. Well, those are all imminent. They are sufficiently imminent to satisfy standing in rightness under Susan B. Anthony List, and let me just point out some of the reasons why the idea... How is that imminent? I don't understand how that's imminent. No one may ever apply. There was a year and four months between their announcement in July of 2018 and the district court opinion, and there was not a single application, so why is it imminent? I think it's misleading to say there were no applications. There is an extensive pre-filing interactive process that is specified in the manual and is common in permit granting situations in this area, in the environmental area, so that the filing of an application is very late in the permit, and that no application was formally filed doesn't mean a draft application wasn't considered, and the controllers over time have publicly stated that they were processing applicants, so there must have been something. We don't have access to this, but they are saying that the process... The representation on the record, there's never been an application. There's never been an application. That doesn't mean there's never been a draft application, and that doesn't mean there's never been a discussion about what it would take to provide... How is New York City harmed by a draft application? A draft application is a big step toward an application. You asked about how long it would take to actually issue a charter. OCC's procedures provide for 30 days of notice, and after that, if everything were ready to go, if they had already interacted sufficiently with the punitive applicant to establish a satisfactory application, it would take another day or two to actually issue the charter, and I just think it's misleading to take the representation... Has New York State had any additional costs in preparation for this happening? You had a line in your brief that I noted on page 28, but there's no affidavit below. There's nothing in the record to suggest that any $1 extra has been spent in preparation for this, right? Well, I think at the outset, there was an expectation that they would need, for instance, to expedite enforcement and to monitor for conversion from state to federal regulation. Once there was a district court judgment in place, it was pretty clear that nothing was going to happen until this court resolved it, and so I don't know that anything additional has happened, but... So you would be saying they're spending, even though New York has spent, has lost no money from revenue, has enclosed not a dollar in costs from this regulation being established, and currently, as we sit here today, no New York State law has been preempted in any way. No, but OCC does claim that even a preliminary approval will preempt New York law, and so the fact that before the complaint was filed, OCC announced it was beginning to accept applications. Before the district court ruled, the comptroller said publicly that a number of But they were apparently going through the application process, and then just six months ago, the comptroller publicly stated he was ready to process applications from payments companies, including non-depository institutions, suggesting that there is a particular interest on the part of OCC in something like PayPal or, you know, payment transmitters. So why are they saying that? No, as I say, they say no application was filed. That can be correct, that no formal application has been filed, and they could still be quite close to issuing a charter, and... I think it would be... They haven't said they aren't. Yeah. I wonder what may... And this is focused on the law for a moment. I don't know which case you would cite, but every case... I looked at the case you cited in your brief, this Texas-United States Fifth Circuit case. There, the state, that is, because of a federal directive, it incurred a financial cost to issue driver's licenses. In the preemption cases, it's where it directly preempted by its passage, at that point, some state law. The New York State versus DHS case, I think Judge Lynch and Judge Obama have been on that panel. There was... The DHS conceded that it was going to be a decrease in public benefits enrollment and a cost then to New York immediate preemption. No, they... It's already filed. It's not quite... I don't think that's quite right. In the Sixth case in particular, Texas had standing to challenge the federal policy of deferring immigration enforcement against parents of lawful residents before the policy went into effect on the ground that it would make, if it went into effect, it would make people eligible for driver's licenses, and the driver's licenses would have costs that none of that happened because the policy was enjoined before it ever went into effect. So it was the expected costs that the state was invoking, the expected driver's license costs. And in the office... In Stilwell, the Office of Thrift Supervision case, an investor had standing to challenge a new Office of Thrift Supervision rule that authorized financial... certain financial institutions to limit the holdings of minority shareholders because... on the ground that some institutions will surely take advantage of their new authority to adopt such a rule, and that will surely operate to the detriment of the plaintiffs who wanted to be a large minority shareholder. So that was totally prospective. And in Air Alliance Houston, the states had standing to challenge a new EPA rule that would delay the effective date of the chemical... of another rule, the chemical disaster rule, because that will lead to preventable disasters, industrial explosions, and so forth, that will impose costs on states. Those were all predictable but not guaranteed costs. And in the case of the Texas situation, they never came into effect, but still, there was standing because they were foreseeable. Just like this case, an announced government policy, every reason to expect it to be implemented imminently is enough to create a substantial risk of imminent harm. And I'd like to contrast that with the recent census case, where the government represented, on the day of Supreme Court argument, as well as earlier, that practical obstacles to implementation might well prevent any harm from occurring. There's nothing like that here. There is no suggestion that this will not go forward. So there's no need to wait. There is the same standing that there was in Texas, in Stilwell, and in Air Alliance, to challenge a government regulation that authorizes conduct that will impose costs on the state. There's no need to wait, and it's risky to wait because, as we've been discussing, the time from formal application, as distinguished from informal application, to issuance of an OCC charter can be very short. And in addition, there is the somewhat more amorphous fact of anticipatory costs. But I'm prepared to rest on the costs that DFS is undergoing right now in having to expedite proceedings and monitor for the expected migration of institutions from state to... Where is that in the record? Where is that? You're saying it's anticipated, but you're saying that hasn't occurred, but it's going to occur, that cost. Is that what you're whether OCC has the authority to charter a non-depository institution, no additional facts are needed to decide that legal question. And as I said, if the court were to reject that claim and to think that it all depends, then it would remand for a determination. What is, could you describe a characteristic institution that would adversely affect the state of New York if it were a FinTech institution? What would be the nature of the kind of institution that you think represents this kind of a threat to New York's regulatory authority? Actually, they range from very large and nationwide like... What do they do? What do they do? PayPal or Venmo that process payments and at present, they have licenses from 50 states. And they qualify because they advance loans? Is that what makes them qualify? Mm, they might. Some of them might advance loans. They also pay checks or transmit payments. Well, transmit payments is not a qualifying thing. It has to be either paychecks. I don't understand it. It has to be paychecks or extend loans or accept deposits, right? Well, and some of them make loans and the loss of usury authority over the... And so that's high end. They're also, as we were discussing, as was being discussed in my colleague's argument, there are payday lenders and check cashers and money remitters who prey on the vulnerable. And whether OCC is interested in those institutions or not, we don't know. But as I say, they exist from the nationwide well-established corporations that do business in 50 states to the local fly-by-nights and everything in between. And New York and the states have been regulating, licensing and protecting consumers in those areas for 150 years. And to suddenly transfer all or some part of that industry from state to federal regulation, take something more explicit than a new interpretation by the OCC of its governing statute. I mean, Congress could certainly authorize such a thing, but it hasn't done so. And the fact that this would work such a dramatic transfer of supervisory and regulatory authority from the states to the federal government... But that happened in 2003, right? In other words, this regulation has been there all along. And we have still, it seems to me, neither one of you has actually been able, as far as I can see, to describe an institution, a financial entity, or even category of financial entities, that they're actually likely to issue any charters to, or that they're interested in issuing charters to. There's a lot of technical stuff that goes on with spending, but you're each asking us in your own way to issue what seems to me a kind of advisory opinion about what constitutes the business of banking in our view, totally divorced from any question about whether any particular entity is engaged in the business of banking. You're saying hypothetically, it must be something that takes deposits. They're saying it could be just about anything under the sun. We don't even know what... Mr. Connolly hasn't really told us what paying checks means, whether cashing checks is that, or whether it's honoring grants is paying checks. You've suggested that it extends as far as transmitting money, or doing whatever Venmo does, about which there is no record here. I'm sure that there are people in my chambers who know what Venmo does better than I do, but there's nothing in the record about that. We're kind of at a loss, at least I feel at a loss, to understand what the case or controversy is. What are they going to do that's so scary? Other than if you take literally what they said in 2003, they could regulate just about anybody who touches money. They've not done anything yet. Well, when they first said that and didn't do anything, it would have been premature to sue. They have now done a lot. They have invited applications from particular segments of the... They've invited applications from fintechs, and Mr. Connolly couldn't tell me what that means. Well... He couldn't even give me an example of a fintech. Can you? What do you understand a fintech to be? I understand a fintech to be a financial... To be a company, judging by their statements, a company that doesn't take deposits or doesn't necessarily take deposits, and that operates essentially on the internet or in some way through modern technology that makes it unnecessary or makes them bypass the taking of deposits, and that reaches very broadly. So far, you've described Google, because you haven't even taken... Google Pay. And also lends money sometimes. Google Pay could also be a fintech under this, or Apple Pay. Some of these payment transmitters. And that is what most recently Acting Comptroller Brooks publicly stated he wanted applications from payments companies, which I take to mean companies that enable one to pay electronically to transfer money. That regulation is overbroad, and we... Our complaint alleges that it is an unreasonable interpretation of the Banking Act. But what if they get one of these applications, and then they think better of this whole idea? Because once they actually see who's applying and what they do, none of them really seem just right. And they don't actually ever... So far, they haven't. They don't actually issue them. Well, I think it's implausible that they haven't already seen some indication of who is interested in applying. Why do we need to speculate on that? I mean, the record may not reflect it, but it is knowable, isn't it, in a district court record to know who has been engaging in the submission of preliminary applications with whom the OCC has been dealing with respect to preliminary applications. But you have not sought discovery of who has submitted any kind of documentation in the nature of a preliminary application or a proposed application. Well, we... We could be having this discussion about knowing exactly who is proposing to submit applications. Could we not, if that had been sought in discovery? We could, and presumably it would be if this case were remanded for a determination of whether the overbreadth of the regulation reaches too many... Reaches companies that shouldn't be covered. But we take the position that in 1863, it was perfectly clear to the Congress that wrote that statute that it was authorizing the creation of enterprises that took deposits and used those deposits to back the loans and the notes and the so forth, the things that it was putting out into the economy, and that the reason for creating a system of nationally chartered banks to supplement or the existing system of state banks was to create a stable, more stable currency that the nation needed. And it's an old statute. It is not a totally open-ended statute. Since the creation of national banks itself was so controversial in the first place, that's another reason to be cautious about treating it as something that can be open-endedly extended by the agency instead of revisited by Congress, if that's what is needed, if the economy has changed sufficiently to require a different form of regulation that should be for Congress and not the OCC. Is there any speculation in the Cognoscenti Press, banking journals and things like that over the likelihood of the new administration adhering to the going ahead with this policy or not going ahead with the proposal? Is that something that's discussed in knowing circles? I have seen no indication that this is being re-evaluated. No speculation in the press, and no, I have no other information. I don't know that it's not so, but this also, this regulation, after all, goes back a long time. There has been interest in doing this at OCC since 2003. That has spanned, is it not correct? The 2003 date is Bush administration. There's another date that was significant in the development of this that was during the Obama administration, and the latest push for opening the door to applications was during the Trump administration. That's correct. So it's pretty fair to say this has been a bipartisan, albeit executive branch, set of interventions. It appears, that's what appears from the outside to be the case, and I would say that it is sort of a question. It is OCC seeking to expand its authority either properly or, as we say, beyond the authority that Congress gave us. And so OCC, no matter who's been at the helm, or at least through many iterations of its leadership, has expressed an interest in doing it, although it only actually commenced doing this in 2018. Thank you, Ms. Underwood. And Mr. Connolly, you have two minutes in rebuttal. Yes, thank you, Your Honor. Just briefly to begin with the standing and right this point, as Judge Bianco indicated in some of his questions, there's no harm being suffered by DFS now. DFS indicated, in fact, in the complaint in 2018, that the precise nature of the regulatory disruption that this might cause is difficult to ascertain, because there's been no application from any fintech. And that's still where we are as of the date of this argument. It still remains nebulous, because there has been no actual application. This argument about preliminary, the formal application comes very late in the process, and there could be preliminary, informal inquiry. That application, what's your response to that? There could be, there could, I suppose, be inquiries by fintechs that want to learn more about this, and that might be thinking about putting in an application. But again, we would disagree with the idea that that's kind of any substantial step in a formal application process. And we sat down in our brief, there's going to be an application, there's an actual application put in, a 30-day notice and comment period, and then eventually there was going to be preliminary conditional approval. And then there's time that needs to elapse while the entity, the applicant fulfills whatever requirements OCC places on it. So, we're just not there yet. When there's an application, we're going to know, and then you're going to at least be able to begin to put some meat on the bones of the kinds of harms that DFS is alleging. But it's also not an imminent harm, because this is very different from the cases that DFS relies on, where you have an imminent harm. And what it really comes down to is, here, it takes two to tango. This is not a federal statute that's been enacted that is going to go into effect that is going to have these harms, and it just hasn't had it yet. This is OCC simply saying, we are willing to consider these types of and that process to proceed for you to even reach the point of imminent harm. But Ms. Underwood was saying that putting it the way you just did is really quite unrealistic, because there is a long procedure in which, before the application is actually submitted, there is a discussion between a proposed applicant and OCC involving a hypothetical draft application that OCC might comment on and encourage changing it in one direction or another and responding in some ways. One of the things I'm wondering about is whether the way this case developed, there was no discovery. There was very little information placed in the record about what's going on, which leaves us very much in the dark about what is being considered. And OCC probably has, I would guess, might have a great deal of control over which applications actually are submitted first, because OCC might well say to an applicant, well, hold off for the now. You better wait, but somebody else is going to apply first and would have the ability to control the selection of which entities apply first when it becomes more ripe. I'm wondering somewhat abstractly whether the lack of ripeness that you are arguing is in large part the result of simply there not having been inquiry into certain things that are knowable now, and it might seem a lot more ripe if those facts were simply made a matter of record at this time. Your Honor, even to the extent that there are some sort of preliminary discussions between OCC and an entity that... Well, Ms. Underwood was not talking about preliminary discussions. She was talking about the likelihood that actual documents are being submitted in the form of an application, but it's not a true application. It's just a draft application and that OCC is commenting on it and perhaps giving proposed applicants a sense of whether their application is likely to sale or not sale, and why, if not, why not, and so forth. Even still, until an applicant takes that actual step of committing their application to writing in a way that they're going to place before OCC, whether and to what extent their potential business operations are going to implicate New York or going to potentially give rise to the remains hypothetical. It's not really conjectural if the applicant has indicated a great desire to have this applicant accepted, but for the moment, they're being told by OCC, wait, not yet, it's too early for you to submit that. We'll tell you when is the appropriate moment for you to put your application in, and until then, we're giving you these comments. You would improve your application by this or by that, by deleting this. It seems to me we would be in a position to know, to understand this case a lot better if those things that are knowable and could have been in the record were in the record as opposed to not being in the record. But any of those preliminary discussions or potentially like a draft application, again, it's still conjectural. It's still hypothetical because it's not necessarily the entity that's going to apply what business model that the entity is going to propose. I mean, that's what we get when we get the actual application. So, Mr. Connolly, you're saying that the preliminary, if somebody has submitted, in fact, which we don't know, a preliminary draft application that OCC has done some negotiation over, there still would not be standing, right? That's your position. There still would not be standing. Okay, fine. That's your position. That's all I ask. Next question. Yes. Now, the next step, there is an application. It's standing or no standing until there's an application that's granted. I think at the very least, your honor, you would need to have preliminary conditional approval of the application. In other words, OCC has a document before it that's setting out who the applicant is, what the business proposal is. And OCC has at least at that preliminary level blessed that. Then I think you may be getting into the potential for imminent harm. Okay. And one last question about this procedural posture that was all referred to, and I just like to make sure I understand what it is. What happened here is the state filed a complaint. You moved to dismiss that complaint on grounds under 12B1 and 12B6 for lack of jurisdiction, meaning lack of standing, and for failure to state a claim. The district court then holds there is standing, so the case can go forward. And I deny the 12B6 motion. Now, what would normally take place then is some discovery into the facts and some further activity. But essentially, the parties got together and said, we both agree that the district court should now enter judgment for the plaintiff, for the state, because the judge has already decided the only issue we're interested in, which is the abstract issue of whether an institution needs to be depository in order to be eligible. And therefore, the district court entered, acquiesced in that and entered in effect a declaration setting aside this regulation. That's what happened. Is that correct? Yes, that's correct. The district court determined that entities that do not accept deposits are not entitled to charters under the National Bank Act. At Chevron step one, the language of the National Bank Act unambiguously requires the taking of deposits. At that point, further development of the nature of an applicant was not something that we were going to even be able to get to because the district court had determined that those types of institutions were eligible to receive these charters. So isn't this underwood correct that if we thought that they're... First issue, we have to decide whether they're standing. There's no question that has to be decided, right? And then secondly, if we decided that, at least hypothetically, there may be institutions that could qualify under the National Banking Act as banks that did not take deposits, depending on exactly what they did. Is she correct that then the next step would be to send it back for the development of some kind of record about what kinds of institutions are in play? Well, I don't know procedurally whether it's sending it back or whether it would be DFS implementing or instituting a new lawsuit based on the facts of an actual application. Well, she says that, again, assuming we get over the standing, she says they have articulated an argument that their first argument is there absolutely needs to be deposits. But their second argument is that at least the... Some kinds of institutions that you might charter would be bad. And you can't articulate what that might be at this stage. I would disagree with that characterization of the nature of their complaint. Their complaint is focused on what they claim is the necessity of deposit taking. That is the basis for their argument that this chartering proposal by OCC that their willingness to accept these types of charter applications runs afoul of the National Bank Act. We can look back at the complaint and figure that out, but you don't agree with her about that as well. I needed to know. Correct. But now the state of New York would have been entitled, would it not, to take discovery prior to the district court's decision with respect to elucidate whether or not there is standing? Perhaps, Your Honor. I mean, to the extent that obviously these are APA claims and the typical practice in APA is that it's decided on the administrative record. And again, given that the nature of their argument is solely that non-depository institutions are not entitled to special purpose national bank charters, and given that it's undisputed that no non-depository institution has applied for a special purpose national bank charter, I don't think that at this point... Standing turns largely on the harm and the likelihood of harm to the plaintiff in the case. And I think now the record is clear that there is no actual harm to DFS. And I would submit also that the record is clear that there's no harm that's imminent. You could have discovery though, even in an APA case, if there was an issue of whether or not there was harm or not, you could have discovery on that. As I said, they didn't put an affidavit in saying we had to accelerate our enforcement team because we're worried about this and we put X number of dollars into doing that. That's the type of thing they could try to demonstrate harm or on the flip side, they could seek discovery from OCC and see if there is someone who's very close, assuming that was a very close to bringing a formal application. That would be within the district court's authority to grant and to order, yes. Respectfully, again, with no application even submitted, let alone any kind of action taken by OCC, it is plainly premature. It doesn't matter what that discovery would show on your end because until there's a formal application, it's too early. At least a formal application, if not other activities, yes. All right. I understand. All right. Thank you to both of you. That was very helpful and a reservable decision. Have a good day. Thank you.